UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
OPEN SOCIETY JUSTICE INITIATIVE, :
:
Plaintiff, :
: 20-CV-5096 (JMF)
-v- :
: OPINION AND ORDER
DEPARTMENT OF DEFENSE et al., :
:
Defendants. :
:
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

    At issue in this case under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, is the proper balance between the American public's right to know what its Government is doing and the Government's need to keep certain activities secret in the name of national security. The case arises out of a FOIA request by Plaintiff Open Society Justice Initiative ("OSJI") for records from fourteen federal agencies regarding the Executive Branch's earliest responses to the COVID-19 pandemic. Thirteen of the fourteen agencies are in the process of providing OSJI with responsive records. But one, the Central Intelligence Agency ("CIA"), has — "pursuant to its customary practice," *ACLU v. Dep't of Def.*, 322 F. Supp. 3d 464, 468 (S.D.N.Y. 2018) ("*ACLU III*") — refused to either confirm or deny the existence of documents responsive to OSJI's requests. Two questions are presented here on cross-motions for summary judgment: first, whether this response — known as a "*Glomar* response" after the Hughes Glomar Explorer, an oceanic research vessel that was at the center of an early FOIA case, *see Phillippi v. C.I.A.*, 546 F.2d 1009 (D.C. Cir. 1976) — was proper; and, second, whether the CIA waived its entitlement to such a response through a statement issued by the Office of the Director of National Intelligence ("ODNI") regarding the intelligence community's involvement in

addressing the threat of COVID-19. For the reasons that follow, the Court holds that the CIA has adequately justified its *Glomar* response to a handful of the topics in OSJI's FOIA request and that it did not waive its entitlement to that response. The Court concludes, however, that the CIA has not adequately justified its *Glomar* response to the other topics in OSJI's request, and reserves judgment on whether the CIA should be required to produce more information or records responsive to these requests pending supplemental submissions.

## BACKGROUND

Between April and June 2020, OSJI, a not-for-profit, public interest law center, submitted FOIA requests to the CIA and thirteen other federal agencies and agency components seeking information relating to the Government's early understanding of, and responses to, the COVID-19 pandemic. *See* ECF No. 1, ¶¶ 29-30; Complaint, ¶¶ 29-31, *Open Soc'y Just. Initiative v. Dep't of Health & Hum. Servs.*, No. 20-CV-6359 (JMF) (S.D.N.Y. Aug. 12, 2020), ECF No. 1. OSJI's request to the CIA consisted of twenty-one discrete parts that were grouped in three categories. *See* ECF No. 57-1 ("FOIA Requests").

The first category, "Notice of SARS-CoV-2 and COVID-19," included the following eleven topics:

1. Records indicating when the Executive Branch was first informed of what is now known as SARS-CoV-2 and/or COVID-19.

2. Records indicating the Executive Branch's response when it was first informed of what is now known as SARS-CoV-2 and/or COVID-19.

3. Records indicating when President Donald Trump was first informed of what is now known as SARS-CoV-2 and/or COVID-19.

4. Records indicating President Trump's response when he was first informed of what is now known as SARS-CoV-2 and/or COVID-19.

5. Records including and/or discussing communications (before March 1, 2020) to and from the National Center for Medical Intelligence ("NCMI") about what is now known as SARS-CoV-2 and/or COVID-19.

2

6. Records including and/or discussing January 2020 communications to and from a State Department epidemiologist about what is now known as SARS-CoV-2 and/or COVID-19.

7. Records including and/or discussing January 2020 communications between Robert Redfield, Director, Centers for Disease Control and Prevention, and Chinese officials about what is now known as SARS-CoV-2 and/or COVID-19.

8. Records including and/or discussing communications (from January 1, 2020 to February 29, 2020) between Alex Azar, Secretary, Health and Human Services, and President Donald Trump about what is now known as SARS-CoV-2 and/or COVID-19.

9. Records including and/or discussing communications (from January 1, 2020 to February 29, 2020) to and from Dr. Carter Mecher, senior medical advisor, Department of Veterans Affairs, about what is now known as SARS-CoV-2 and/or COVID-19.

10. Records including and/or discussing communications (from January 1, 2020 to March 31, 2020) to and from Robert Kadlec, Assistant Secretary for Preparedness and Response, about asymptomatic cases spreading what is now known as SARS-CoV-2 and/or COVID-19.

11. Records discussing communications (from January 1, 2020 to February 29, 2020) from Peter Navarro, President Trump's trade advisor, about what is now known as SARS-CoV-2 and/or COVID-19.

FOIA Requests 2 (footnotes omitted).

The second category, "The Executive Branch's Efforts to Counter SARS-CoV-2 and COVID-19," included the following eight topics:

12. Records concerning extraordinary presidential authority, including but not limited to "presidential emergency actions" relating to what is now known as SARS-CoV-2 and/or COVID-19.

13. Records indicating dates and agendas for meetings and decisions of the official White House coronavirus task force during January and February 2020.

14. Records including and/or discussing "Four steps to mitigation," a February/March 2020 plan for addressing what is now known as SARS-CoV-2 and/or COVID-19.

15. Records including and/or discussing a February 2020 document titled "U.S. Government Response to the 2019 Novel Coronavirus."

16. Records discussing Remdesivir, Chloroquine, Hydroxychloroquine ("Plaquenil"), Azithromycin ("Zithromax") and/or other drugs or substances, such as disinfectants, for treating what is now known as SARS-CoV-2 and/or COVID-19.

17. Records including and/or discussing instructions to classify meetings and/or records relating to what is now known as SARS-CoV-2 and/or COVID-19.

18. Communications between your agency and the White House regarding what is now known as SARS-CoV-2 and/or COVID-19.

19. Communications between the Executive Branch and non-government entities (including but not limited to private-sector companies, academic institutions and/or individuals) capable of developing tests, or assisting in testing, for what is now known as SARS-CoV-2 and/or COVID-19.

*Id.* at 2-3 (footnotes omitted).

Finally, the third category, "Executive Branch SARS-CoV-2 and COVID-19 Communications with Congress, State Governors, and the [World Health Organization]," contained the following two topics:

20. Records including and/or discussing communications (before March 1, 2020) between any member of the Executive Branch and Congress regarding what is now known as SARS-CoV-2 and/or COVID-19, including but not limited to briefings to Congress, members of Congress, Congressional Committees or Subcommittees, and/or Congressional staff about what is now known as SARS-CoV-2 and/or COVID-19.

21. Records including and/or discussing communications between the Executive Branch and the World Health Organization ("WHO") about what is now known as SARS-CoV-2 and/or COVID-19.

*Id.* at 3 (footnotes omitted).

On May 12, 2020, the CIA issued a *Glomar* response, indicating that, based on two of FOIA's exemptions, it could "neither confirm nor deny the existence or nonexistence of records responsive to [OSJI's] request. The fact of the existence or nonexistence of such records is itself currently and properly classified and is intelligence sources and methods information protected from disclosure by . . . the National Security Act of 1947, as amended." ECF No. 57-2, at 3. On June 1, 2020, OSJI appealed to the CIA Agency Relief Panel, ECF No. 57-3, from which it

4

received no response, ECF No. 72 ("Pl.'s Br."), at 8. Thereafter, OSJI filed this case.[1] OSJI and the CIA now cross-move for summary judgment. ECF Nos. 55 & 71.

## LEGAL STANDARDS

Congress's purpose in enacting FOIA was "to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (internal quotation marks omitted). To that end, although FOIA "calls for broad disclosure of Government records," it also exempts from disclosure nine categories of information. *C.I.A. v. Sims*, 471 U.S. 159, 166-67 (1985). Two of the nine exemptions are relevant here. First, Exemption 1 shields materials "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and . . . in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1)(A). As relevant here, Executive Order 13,526 provides such protection for certain information pertaining to "intelligence activities (including covert action)," "intelligence sources or methods," "foreign government information," or "foreign relations or foreign activities of the United States." Classified National Security Information, Exec. Order No. 13,526, § 1.4, 75 Fed. Reg. 707 (Dec. 29, 2009); *see* ECF No. 57 ("Blaine Decl."), ¶ 12. Second, Exemption 3 shields materials "specifically exempted from disclosure by statute." 5 U.S.C. § 552(b)(3). As relevant here, the National Security Act of 1947, as amended, mandates that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1).

---

[1] The case is consolidated with *Open Society Justice Initiative v. Department of Health & Human Services*, No. 20-CV-6359 (JMF) (S.D.N.Y.). *See* ECF No. 43. Taken together, the two cases seek records from a total of fourteen federal agencies. The other agencies are processing records pursuant to a schedule set by the Court. *See* ECF Nos. 62, 69, 70, 76, 81, 84, 86, 88, 89.

When the Government invokes an exemption in response to a FOIA request, it is common for it to prepare a "*Vaughn* index" listing "the titles and descriptions of the responsive documents that the Government contends are exempt from disclosure." *N.Y. Times Co. v. U.S. Dep't of Just.*, 758 F.3d 436, 438-39 (2d Cir. 2014) ("*NY Times II*"), *supplemented*, 762 F.3d 233 (2d Cir. 2014). In "unusual" circumstances, however, the FOIA exemptions may allow for even less disclosure than that. *Florez v. C.I.A.*, 829 F.3d 178, 182 (2d Cir. 2016) (internal quotation marks omitted). First, the Government may provide a *Glomar* response, refusing "to confirm or deny the existence of requested records because acknowledging even the existence [or nonexistence] of certain records would reveal information entitled to be protected." *NY Times II*, 758 F.3d at 438 n.3. Second, where the mere existence or nonexistence of responsive records is not exempt, but the particulars of the records are, the Government may submit "a 'no number, no list' response," in which it "acknowledges that it has responsive documents, but declines to further describe or even enumerate on the public record the number, types, dates, or other descriptive information about these responsive records." *Open Soc'y Just. Initiative v. C.I.A.*, 505 F. Supp. 3d 234, 244 (S.D.N.Y. 2020) (cleaned up). In either case, the Government may withhold information — whether that information is the existence or non-existence of responsive records or the particulars of responsive records — only if that information is, itself, "protected from disclosure by a FOIA exemption." *N.Y. Times Co. v. U.S. Dep't of Just.*, 756 F.3d 100, 122 (2d Cir. 2014) ("*NY Times I*"), *opinion amended on other grounds*, 758 F.3d 436 (2d Cir. 2014), *supplemented on other grounds*, 762 F.3d 233 (2d Cir. 2014). And as the Second Circuit has emphasized, "[s]uch a response would only be justified in unusual circumstances, and only by a particularly persuasive affidavit." *Id.* (internal quotation marks omitted).

Significantly, even if otherwise properly invoked, FOIA's exemptions are not absolute. As relevant here, "[w]hen an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." *N.Y. Times v. C.I.A.*, 965 F.3d 109, 115-16 (2d Cir. 2020) ("*NY Times III*") (internal quotation marks omitted). In the Second Circuit, a "precise and strict test" applies to claims of official acknowledgement with respect to classified information. *Id.* at 116 (internal quotation marks omitted). "Classified information that a party seeks to obtain or publish is deemed to have been officially disclosed only if it (1) is as specific as the information previously released, (2) matches the information previously disclosed, and (3) was made public through an official and documented disclosure." *Wilson v. C.I.A.*, 586 F.3d 171, 186 (2d Cir. 2009) (cleaned up).[2] The "specificity and matching prongs" of the test "work together to form the crux of the official disclosure doctrine: disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Osen LLC*, 969 F.3d at 110 (internal quotation marks omitted); *see also, e.g.*, *ACLU III*, 322 F. Supp. 3d at 480 n.7 (noting that, "in the Glomar context, the first and second prongs

---

[2] The Second Circuit has questioned the provenance and soundness of the *Wilson* test, *see, e.g.*, *NY Times I*, 756 F.3d at 120 n.19, but it "remains the law of this Circuit," *id.*; *see also Osen LLC v. U.S. Cent. Command*, 969 F.3d 102, 111 n.5 (2d Cir. 2020); *NY Times III*, 965 F.3d at 116. OSJI urges the Court to read into the *Wilson* test a "central legal requirement that the withholding agency's claim that disclosure of the requested information would cause harm is logical and plausible despite the information the agency is alleged to have officially acknowledged." Pl.'s Br. 19. Although that request does find some support in the language of *NY Times I*, 756 F.3d at 120, more recent Second Circuit decisions have recited the *Wilson* test without that gloss, *see, e.g.*, *Osen LLC*, 969 F.3d at 111 n.5 ("Ultimately . . . *Wilson* remains the law in this Circuit. Until it is overturned *en banc* or by the Supreme Court, we will continue to apply *Wilson*."); *NY Times III*, 965 F.3d at 116 (applying the traditional three-part *Wilson* test). Accordingly, the Court declines to read *NY Times I* as having altered the traditional *Wilson* test. *See also ACLU III*, 322 F. Supp. 3d at 480 (declining to address whether the *Wilson* test "has been supplanted entirely by the 'logical and plausible' standard").

of [the *Wilson* test] merge into one" because, by definition, "if the prior disclosure establishes the existence (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue — the existence of records — and the specific request for that information" (internal quotation marks omitted)).

In general, FOIA actions filed in court are resolved through summary judgment motion practice. *See, e.g.*, *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999). "In resolving summary judgment motions in a FOIA case, a district court proceeds primarily by affidavits in lieu of other documentary or testimonial evidence . . . ." *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012). As the Second Circuit has explained, "[s]ummary judgment is warranted . . . when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). Although the agency's determination that requested information falls within a FOIA exemption is reviewed *de novo*, *see* 5 U.S.C. § 552(a)(4)(B); *Dep't of Air Force v. Rose*, 425 U.S. 352, 379 (1976), the affidavits submitted by the agency in support of its determination "are accorded a presumption of good faith," *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994) (internal quotation marks omitted). This is particularly true in the national security context, where courts are to give the affidavits or declarations "substantial weight." *Osen LLC*, 969 F.3d at 115. Ultimately, "the agency's justification" for whatever information was withheld "is sufficient if it appears logical and plausible." *ACLU v. U.S. Dep't of Def.*, 901 F.3d 125, 133-34 & n.9 (2d Cir. 2018) ("*ACLU IV*"), *as amended* (Aug. 22, 2018).

**DISCUSSION**

The CIA's *Glomar* response to OSJI's requests was based, and is defended here, on FOIA Exemptions 1 and 3. *See* ECF No. 57-2, at 4; Blaine Decl. ¶ 12. OSJI contends that the CIA has not sufficiently justified its reliance on these exemptions. Alternatively, it contends that, "as to at least" two of the topics of its FOIA requests — namely, Topic 2, which seeks "[r]ecords indicating the Executive Branch's response when it was first informed" of COVID-19 or the virus that causes it, and Topic 18, which seeks "[c]ommunications between [the CIA] and the White House regarding" the same — the CIA's "reliance on Glomar is unavailable" because it "has officially acknowledged" the existence or non-existence of responsive records. Pl.'s Br. 11. The Court will take OSJI's arguments in reverse order.

**A. Official Acknowledgement**

OSJI's invocation of the official acknowledgment doctrine is based solely on a single, four-sentence press release (the "Press Release") issued by the ODNI on April 30, 2020. *See* Pl.'s Br. 17-22. The Press Release, titled "Intelligence Community Statement on Origins of COVID-19," stated in its entirety:

> The entire Intelligence Community has been consistently providing critical support to U.S. policymakers and those responding to the COVID-19 virus, which originated in China. The Intelligence Community also concurs with the wide scientific consensus that the COVID-19 virus was not manmade or genetically modified.
>
> As we do in all crises, the Community's experts respond by surging resources and producing critical intelligence on issues vital to U.S. national security. The [Intelligence Community] will continue to rigorously examine emerging information and intelligence to determine whether the outbreak began through contact with infected animals or if it was the result of an accident at a laboratory in Wuhan.

ECF No. 73-1 ("Press Release"). OSJI contends that the CIA "joined in issuing" this statement, Pl.'s Br. 6, and, in doing so, "disclosed in no uncertain terms CIA's interest and role in responding to the pandemic, including devoting resources to respond to the pandemic,

investigating the origins of the outbreak, evaluating the scientific community's consensus about the natural origins of the virus itself, and committing itself to continue its focus on responding to the pandemic," *id.* at 20. As a result, OSJI argues, the CIA has waived any otherwise-applicable FOIA exemptions with respect to Topics 2 and 18. *See id.* at 20-22. The Court is unpersuaded.[3]

That is because the Press Release does not satisfy the specificity and matching prongs of the "precise and strict" *Wilson* test with respect to either Topic 2 or Topic 18. Take Topic 2. At most, by admitting that the CIA was "providing critical support" to "policymakers and those responding" to the virus, "surging resources and producing critical intelligence," and "rigorously examin[ing] emerging information and intelligence," Press Release 2, the Press Release may have revealed that the CIA would have *some* records concerning COVID-19. As noted, however, the "disclosure of similar information does not suffice; instead, the *specific* information

---

[3] At the outset, it is not clear that the official acknowledgement doctrine could apply because the Press Release was a statement by the ODNI, *not* the CIA, and waiver by official disclosure is "limited only to official and public disclosures made by the same agency providing the *Glomar* response, and therefore does not 'requir[e] [the agency] to break its silence' as a result of 'statements made by another agency.'" *Florez*, 829 F.3d at 186 (quoting *Frugone v. C.I.A.*, 169 F.3d 772, 775 (D.C. Cir. 1999)). OSJI asserts that the CIA "joined in" issuing the Press Release and, in that vein, repeatedly refers to the Press Release as the "Joint Statement," Pl.'s Br. 6-7, 20-22, but it provides no support for its assertion beyond the ODNI's use of the pronoun "we" and reference to the "entire Intelligence Community," *id.* at 20 (emphasis omitted); ECF No. 83 ("Pl.'s Reply"), at 10. That does not suffice under the "precise and strict" test for the official acknowledgement doctrine. *NY Times III*, 965 F.3d at 116, 121-22. That said, courts have held that disclosures made by "authorized representative[s] of the agency's parent" are sufficient to satisfy the official acknowledgement doctrine, *ACLU v. C.I.A.*, 710 F.3d 422, 429 n.7 (D.C. Cir. 2013) ("*ACLU II*"), and an argument could be made that the ODNI is the CIA's "parent" agency given that the CIA Director reports to the Director of National Intelligence, *see* 50 U.S.C. § 3036(b), and that the latter is "head" of the "intelligence community," which includes the CIA, *see id.* §§ 3003(4)(B), 3023(b)(1); *see Am. Ctr. for L. & Just. v. U.S. Nat'l Sec. Agency*, 474 F. Supp. 3d 109, 123 n.10 (D.D.C. 2020) (finding that the ODNI was, for FOIA purposes, a "'parent' . . . across all subordinate intelligence units," including the State Department's Bureau of Intelligence and Research). The parties have not briefed the issue, however, and Court need not — and does not — resolve it here. *See Competitive Enter. Inst. v. Nat'l Sec. Agency*, 78 F. Supp. 3d 45, 57-58 (D.D.C. 2015) (declining to resolve the issue of whether the ODNI was the National Security Agency's "parent agency").

sought by the plaintiff must already be in the public domain by official disclosure." *Osen LLC*, 969 F.3d 110 (quoting *Wolf v. C.I.A*., 473 F.3d 370, 378 (D.C. Cir. 2007)). That requirement is not satisfied. Topic 2 does not seek information pertaining to whether the CIA or other parts of the Executive Branch learned about COVID-19 or whether the CIA or other parts of the Executive Branch had a response when they first learned about COVID-19. Instead, it seeks more specific information: whether the CIA possesses records relating to the Executive Branch's response to COVID-19 *when the Executive Branch* was first informed of the disease. *See* FOIA Requests, ¶ 2 (seeking "[r]ecords indicating the Executive Branch's response when *it* was first informed" of COVID-19 (emphasis added)). Nothing in the Press Release speaks to the response of the Executive Branch writ large (not to mention any component thereof) when it first became aware of COVID-19, let alone to whether the CIA possesses records on that subject.

Similarly, OSJI fails to satisfy the specificity and matching requirements with respect to Topic 18. It seeks records concerning communications between the CIA and the White House relating to COVID-19. But nowhere in the Press Release does the CIA (assuming *arguendo* that the Press Release even constitutes a disclosure by the CIA) admit that it had any communications with the White House or that it possesses records of such communications. Thus, even though "the matching aspect of the *Wilson* test does not require 'absolute identity,'" *NY Times III*, 965 F.3d at 118 (quoting *NY Times I*, 756 F.3d at 120), there are "substantive differences between the content of the [Press Release] and the withheld information," *Osen LLC*, 969 F.3d at 110 (quoting *ACLU v. U.S. Dep't of Def*., 628 F.3d 612, 620-21 (D.C. Cir. 2011) ("*ACLU I*")). OSJI contends that "it is difficult to believe [the] CIA, much less the entire intelligence community, would have been permitted to issue the [Press Release] at all without communicating with the White House." Pl.'s Br. 21. But such speculation, however reasonable, does not suffice to

11

establish official acknowledgment. *See, e.g.*, *NY Times III*, 965 F.3d at 116 ("[J]ust because the existence of classified activity may be inferred from publicly available information or from official statements, government waiver will not be found unless all legal criteria have been met"); *see also Leopold v. C.I.A.*, 987 F.3d 163, 171 (D.C. Cir. 2021) (holding that the district court had erred in ordering more disclosure based on the "assumption" that "it seems wildly unlikely that, in the eight and a half years since the Syrian civil war began, the Central Intelligence Agency has done no intelligence-gathering that produced a single record even pertaining to payments to Syrian rebels" (cleaned up)).

In short, assuming that the CIA's *Glomar* response is justified under one of FOIA's exemptions, the official acknowledgement doctrine does not call for more disclosure. Thus, the Court will turn to whether the CIA has adequately justified its *Glomar* response.

## B. Sufficiency of the CIA's Justification for Exemptions 1 and 3

The CIA's justification for its *Glomar* response is contained in the sixteen-page declaration from Vanna Blaine, a CIA Information Review Officer. Upon review of the Declaration, the Court concludes that the CIA provides sufficient justification for its *Glomar* response to five of the twenty-one topics in OSJI's request. First, in reference to Topic 3, which seeks "[r]ecords indicating when President Donald Trump was first informed of what is now known as SARS-CoV-2 and/or COVID-19," Officer Blaine explains that confirming the existence or non-existence of responsive records "could indicate whether the CIA possessed the ability to identify and provide the White House with an early warning about the virus, or whether initial notice instead came from another organization or agency." Blaine Decl. ¶ 19. "Such information," she elaborates, "would further alert our adversaries and allies alike of the extent to which [the] CIA did or did not gather and share such information . . . [and] what the CIA's

capabilities or weaknesses might be with respect to gathering such information in the future." *Id.* Giving due deference to the CIA's views, that explanation for the *Glomar* response to Topic 2 is "logical and plausible." *Wilner*, 592 F.3d at 75. It is also sufficient to cover Topics 1, 2, and 4, responses to which would also tend to reveal whether and to what extent the CIA was on the front line of surveilling and responding to the emerging viral threat.

Similarly, in reference to Topic 16, which calls for "[r]ecords discussing Remdesivir, Chloroquine, Hydroxychloroquine ('Plaquenil'), Azithromycin ('Zithromax') and/or other drugs or substances, such as disinfectants, for treating what is now known as SARS-CoV-2 and/or COVID-19," Officer Blaine explains that confirming the existence or non-existence of responsive records would reveal "whether [the] CIA did or did not determine such scientific research information to be of intelligence value, or that it lacked the capability to gather such information." Blaine Decl. ¶ 21. More broadly, she explains that "[t]he CIA's mission" — namely, the gathering of foreign intelligence from other countries — "is fundamentally different from that of . . . a national health organization" or scientific agency. *Id.* ¶ 20. As a result, whether and to what extent the agency is involved in generating or collecting "scientific data or research" is, in itself, sensitive national security information and properly classified. *Id.* It is "logical and plausible" to maintain that confirming the existence or non-existence of records responsive to Topic 16 could reveal such information. *Wilner*, 592 F.3d at 75. Accordingly, once again, the Court concludes that the CIA properly invoked *Glomar* in response to Topic 16.

By contrast, the Court concludes that the Blaine Declaration does not satisfy the CIA's burden with respect to the remaining sixteen topics in OSJI's request. The rationales discussed above do not bear directly on these other topics. And the rest of the Blaine Declaration is nowhere near as specific in explaining why the CIA cannot even confirm the existence or non-

13

existence of responsive documents. Indeed, what remains are several pages of general background (regarding OSJI's request, the CIA's response, the FOIA process generally, and Exemptions 1 and 3) and only "conclusory," "vague," and "sweeping" assertions about the sensitivities of the CIA's activities and records generally. *ACLU III*, 322 F. Supp. 3d at 473 (quoting *Larson*, 565 F.3d at 864). In many instances, the Declaration "merely recite[s] [the] statutory standards" as justification for the CIA's *Glomar* responses. *Id.* (internal quotation marks omitted). This kind of "*ipse dixit*" is plainly not enough as it fails to "educate the Court" on why a *Glomar* response — as opposed to, say, a "no number, no list" or the creation of a *Vaughn* index — is appropriate. *ACLU v. Dep't of Def.*, 492 F. Supp. 3d 250, 262 (S.D.N.Y. 2020) ("*ACLU V*"). To hold otherwise, and to accept the CIA's *Glomar* response based on little more than its say so, would be to create a wholesale "CIA exception" to FOIA, which Congress itself has not done. Judicial deference in the area of national security is certainly warranted. But "deference is not equivalent to acquiescence." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999); *cf. ACLU IV*, 901 F.3d at 134 ("'[C]oncerns of national security . . . do not warrant abdication of the judicial role.' Deference to the executive's national security . . . judgment[] is appropriate only where we have sufficient information to evaluate whether those judgments were logical and plausible." (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (citation omitted)).

That said, the Court is not prepared, at this time, to order the CIA to produce records that are responsive to these sixteen topics or even to provide a *Vaughn* index identifying them and explaining why they are being withheld, as OSJI requests. Pl.'s Br. 22-23. Given the national security sensitivities involved, it would not be reasonable for the Court to conclude that the CIA loses any entitlement to a FOIA exemption merely because its initial explanation was too

circumspect.  Put differently, the law should not require an intelligence agency to err on the side of more disclosure for fear that if a court concludes that its explanation for withholding information falls short of the mark it will not be able to withhold anything.  Thus, following the example of other courts, the Court will give the CIA one more chance to make an adequate record for its Glomar response with respect to Topics 5-15 and 17-21.  *See, e.g.*, *ACLU III*, 322 F. Supp. 3d at 480-81 (concluding that most of the CIA's *Glomar* responses were insufficient but granting the CIA a "second chance" to present a "a more targeted Glomar submission"); *cf. Nat. Res. Def. Council v. U.S. Env't Prot. Agency*, No. 17-CV-5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019) (concluding that an agency's "generic, across-the-board articulations of harm" were insufficient and ordering the agency to submit a revised affidavit and/or *Vaughn* index that "more specifically and particularly describe[d] the . . . interests that would be harmed by disclosure").  The CIA's supplemental submissions should address the substance of *each* remaining topic with reasonably specific detail.  In addition, they should demonstrate why a response less extreme than *Glomar* — including but not limited to a "no number, no list" response, *see, e.g.*, *NY Times I*, 756 F.3d at 105 & n.2; *Open Soc'y*, 505 F. Supp. 3d at 244 — would not be appropriate as to some or all of OSJI's requests.

## CONCLUSION

For the reasons stated above, the CIA's motion for summary judgment is GRANTED and OSJI's summary judgment motion is DENIED with respect to the question of whether an official disclosure waived the CIA's entitlement to issue a *Glomar* response to Topics 2 and 18 and with respect to the propriety of the CIA's *Glomar* response to Topics 1-4 and 16.  The Court reserves judgment on the propriety of the CIA's *Glomar* response to Topics 5-15 and 17-21.

To the extent that the CIA wishes to defend its *Glomar* response to any of the remaining sixteen topics, it shall file a supplemental declaration and supplemental memorandum of law, not to exceed ten pages, **within three weeks of the date of this Opinion and Order**. OSJI shall file any responsive memorandum of law, not to exceed ten pages, **within two weeks of the CIA's supplemental submissions**. No further briefing will be permitted absent leave of Court.

The Clerk of Court is directed to terminate ECF Nos. 55 and 71.

SO ORDERED.

Dated: July 15, 2021
New York, New York

JESSE M. FURMAN
United States District Judge